IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ANTONIO NEGRETE-SAENZ,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No. CV-F-08-852 OWW<br>(No. CR-F-02-5408 OWW)<br><br>MEMORANDUM DECISION AND ORDER DENYING PETITIONER'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT |

On June 11, 2008, pursuant to the "mailbox rule," Petitioner Marco Antonio Negrete-Saenz timely filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.

Petitioner was charged in Count One of the Third Superseding Indictment with co-defendants Manuel Solorzano Contino aka Victor Sanchez Sepulveda, Gilberto Maldonado, and Javier Villavicencio as follows:

> defendants herein, beginning at a time unknown to the grand jury, but not later than on or about August 1, 2002, and continuing to

1

> on or about August 3, 2002, in the County of Stanislaus, State and Eastern District of California, and elsewhere, did knowingly and intentionally agree and conspire with each other and with other persons unknown to the Grand Jury, to aid and abet the manufacture of 50 grams or more of methamphetamine, a Schedule II controlled substance, and to possess pseudoephedrine, a listed chemical, knowing or having reasonable cause to believe it would be used to manufacture methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(c)(2), and 846.

Petitioner was also charged with attempted possession of pseudoephedrine, intending to manufacture methamphetamine (Count Two); possession of a firearm in furtherance of a drug trafficking crime (Count Three); unlawful use of a communication facility to facilitate a felony narcotic offense and aiding and abetting (Count Four); maintaining a manufacturing operation (Count Five); and criminal forfeiture (Count Six).  Petitioner was convicted by jury trial of Counts One, Two and Four and found not guilty of Counts Two and Five.  Petitioner was sentenced to 235 months incarceration and a 60 month term of supervised release.

Petitioner appealed to the Ninth Circuit on the sole ground that the District Court erred by denying a two-level reduction in offense level for acceptance of responsibility.  The Ninth Circuit affirmed Petitioner's conviction and sentence.

A.   <u>Ineffective Assistance of Counsel</u>.

Petitioner contends that he was denied the effective assistance of trial and appellate counsel because of their

failure to challenge Count One of the Third Superseding Indictment as duplicitous, by failing to request a special verdict, and failing to raise the absence of a special verdict as plain error on appeal.

       1.   <u>Governing Standards</u>.

To establish an ineffective assistance of counsel claim, Petitioner must show: (1) the representation was deficient, falling "below an objective standard of reasonableness"; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court need not evaluate both prongs of the *Strickland* test if the petitioner fails to establish one or the other. *Strickland*, *id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1152 (9th Cir.1998), *cert. denied*, 526 U.S. 1055 (1999).

Under the first prong, Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct of counsel's performance at the time." *Id.* at 689. The proper inquiry is whether, "in light of

all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*  The court must apply "a heavy measure of deference to counsel's judgments," and "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 690-691.  "The relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir.1988).  "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel." *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir.1989).  A decision to waive an issue where there is little or no likelihood of success and concentrate on other issues is indicative of competence, not ineffectiveness.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989).

To meet the prejudice requirement, the petitioner must demonstrate that errors "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693.  "It is [also] not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.*  "Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Id.*  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* at 694.

       2.  <u>Duplicitous Indictment</u>.

Petitioner asserts that he was denied the effective assistance of trial and appellate counsel because of their failure to challenge Count One of the Third Superseding Indictment as duplicitous.

An indictment may allege several substantive offenses in a conspiracy count because a conspiracy can have more than one object.  *United States v. Begay*, 42 F.3d 486, 501 (9th Cir.1994); *United States v. Smith*, 891 F.2d 703, 712 (9th Cir.1989).  As explained in *United States v. Zemek*, 634 F.2d 1159, 1167-1168 (9th Cir.1980):

> The general test is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy ... Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.' ... The general test also comprehends the existence of subgroups or subagreements.
>
> Several circuits have applied a 'factors' analysis to distinguish single from multiple conspiracies ... Relevant factors include the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals.  A single conspiracy can be identified here either by isolating various elements under the 'factors' analysis or by aggregating evidence under the 'single agreement' test.

On July 30, 2002, a reliable confidential informant

contacted Agent Anthony Arguelles of the Stanislaus County Drug Enforcement Agency and advised that he had met with Negrete, an itinerant field worker, at a well-known drug traffickers' bar in Turlock, California.[1]  During their conversation, Negrete told the informant that he was interested in purchasing twenty cases of pseudoephedrine pills (which would contain 345,600 pseudoephedrine pills).  The next day, Agent Arguelles monitored a telephone call between the informant and Negrete to discuss the twenty case pseudoephedrine pill transaction.  They agreed at that time to meet the next day at a Jack in the Box restaurant in Turlock. On August 1, 2002, Negrete met with the informant at the Jack in the Box, as agreed.  Negrete continued to negotiate for the purchase of twenty cases of pseudoephedrine for $76,000.  Negrete also discussed the possibility of selling methamphetamine to the informant.  Negrete then drove to his residence at 900 S. First Street in Turlock, which is a short distance from the Jack in the Box restaurant, to try to obtain a sample of methamphetamine.  About one-half hour later, Negrete returned to the Jack in the Box empty-handed but continued to discuss the purchase of twenty cases of pseudoephedrine.  The informant provided a sample of pseudoephedrine pills to Negrete.  Negrete told the informant that he would have his associates test the pseudoephedrine to see if it was "good."  Negrete agreed to do

---

[1]This statement of facts is derived from the Government's brief to the Ninth Circuit in response to Petitioner's appeal from his conviction and sentence.

1  the deal on August 3, 2002.  On August 2, 2002, Negrete called
2  the informant and said that he still wanted twenty cases of
3  pseudoephedrine but could not come up with $76,000.  Instead,
4  Negrete offered to trade $23,000 in cash, three pounds of
5  methamphetamine having an estimated street value of $7,000 to
6  $9,000, and a brand new Chevrolet Tahoe for which the informant
7  "could receive a good amount of money ... on the black market."
8  After this telephone call, Negrete, Vega, Sanchez, Maldonado, and
9  Villavicencio all made telephonic contact with each other in
10 anticipation of the pseudoephedrine pill deal to occur the next
11 day.  On August 3, 2002, Negrete and Vega arrived together in a
12 silver Chevrolet pickup at the Home Depot parking lot at 2800
13 Countryside Drive in Turlock and met with the informant.  At the
14 outset, Negrete and Vega told the informant that they were not
15 happy with the location, because many drug dealers had been
16 arrested there in the past.  While Negrete and Vega continued to
17 negotiate with the informant, Sanchez, who was driving a gray
18 Chevrolet Avalanche, was conducting counter-surveillance in the
19 Home Depot parking lot.  During their negotiations, Negrete
20 repeatedly referred to Villavicencio as his 'compa' or partner,
21 who had the three pounds of methamphetamine, $23,000 in cash, and
22 the Tahoe, which Villavicencio was driving, for trade.  After
23 Vega and Negrete told the informant that the money and drugs
24 would be ready in about thirty minutes, they left the Home Depot
25 parking lot and drove to Sunny View Park at 700 S. Berkeley
26 Avenue in Turlock to pick up the Tahoe, money and

methamphetamine.

After meeting with Villavicencio, Negrete and Vega returned to the Home Depot parking lot, while Sanchez continued to conduct counter-surveillance.  Negrete told the informant that Villavicencio wanted to move the transaction to a different location.  A few minutes later, Vega called Villavicencio to convince him to complete the deal at the Home Deport parking lot. Vega then left the Home Depot parking lot in the Chevrolet pickup, while Negrete continued negotiating with the informant. Several minutes later, Vega and Sanchez, driving their respective vehicles, returned to Sunny View Park, where they met with Villavicencio.  A short time later, co-defendant Maldonado, who was driving a Chevrolet Suburban, also arrived at the park, made a call on his cellular telephone, and then left.  Several minutes later, Vega also left the park and returned to the Home Depot parking lot, where Vega and Negrete continued to negotiate with the informant.  Vega told the informant that Villavicencio wanted to see the pseudoephedrine before concluding the deal.  The informant then retrieved a bottle of pseudoephedrine from his vehicle and showed it to Negrete and Vega.  After inspecting the pills, Negrete and Vega told the informant they liked what they saw and said they would arrange for the deal to occur.  They then again left the Home Depot parking lot and returned to Sunny View Park.  Maldonado arrived shortly thereafter.

At the park, Maldonado, Negrete, and Vega met and conferred with Villavicencio.  Negrete and Vega then returned to the Home

Depot parking lot, as did Sanchez, all in their respective vehicles, where they all met and continued to negotiate with the informant. After the informant showed Sanchez the sample bottles of pseudoephedrine, Sanchez offered $11,000 in cash, along with his Avalanche, in exchange for the twenty cases of pseudoephedrine. Sanchez further indicated that 'another partner' who had the cash would arrive shortly. At that time, Maldonado arrived at the Home Depot parking lot. Vega then met with Maldonado and returned to the informant with the money. The informant then advised that $11,000 in cash was insufficient. Sanchez said he could get more money and would leave his Avalanche as a security deposit until he could gather more cash. He also stated that Maldonado's Suburban was available for trade. Vega then gave the informant the purported $11,000, along with the keys to Sanchez' Avalanche. When the bust signal was given, Negrete, Maldonado, Vega and Sanchez ran from the area but were ultimately arrested.

At the time of his arrest, Villavicencio provided false information to the agents. After counting the seized cash, law enforcement agents determined that the defendants had not delivered $11,000 in cash but had only delivered $10,600 and two counterfeit $50 bills. In addition, agents found a stolen Glock 9 millimeter firearm in Maldonado's vehicle. A search of Negrete's residence revealed an ephedrine extraction laboratory in the garage, which indicated that the extraction of large amounts of pseudoephedrine had occurred there. In addition, a

1  .22 caliber pistol and a bag of 9 millimeter and .22 caliber
2  ammunition were seized from the lab.  Negrete did not provide a
3  post-arrest statement, but his co-defendants did.  Maldonado said
4  that Negrete had recruited him for the drug deal and said he
5  would pay Maldonado $1,000 in cash for his assistance.  Vega said
6  that he was recruited by Negrete and Villavicencio to assist
7  Negrete in negotiating for the purchase of pseudoephedrine pills.

9      Petitioner argues that the factors used to determine whether
10 a conspiracy is duplicitous shows that Count One charged two
11 conspiracies - one to aid and abet the manufacture of
12 methamphetamine and the second to possess pseudoephedrine, a
13 listed chemical, knowing or having reasonable cause to believe it
14 would be used to manufacture methamphetamine.  Petitioner argues
15 that the "nature of the conspiracy" suggests two conspiracies:

> The primary agreement between the informant and petitioner and his co-defendants was the purchase of 20 cases of pseudoephedrine to petitioner [sic].  The evidence does not show that the parties contemplated or discussed any plans for the manufacturing of methamphetamine.
>
> The conspiracy to [sic] a sale of methamphetamine by Marco to the informant was pursuant to a separate agreement, made after the informant and petitioner discussed the purchase and sale of 20 cases of pseudoephedrine at $3,000 per case.  The commonality of time factor also points to two conspiracies.  In first [sic] place, the informant offered to sell to petitioner and his co-defendants 20 cases of pseudoephedrine at $3,000 per case on August 1, 2002, while the conspiracy to a sale of methamphetamine to the informant after [sic] it was

10

1 manufacture emerged on August 1 & 2, 2002.

2 Petitioner's contention is without merit. The evidence
3 demonstrates that there was a single conspiracy to acquire
4 pseudoephedrine to extract ephedrine from it to aid and abet the
5 manufacture of methamphetamine. Petitioner's reliance on *United*
6 *States v. Gordon*, 844 F.2d 1397 (9th Cir.1988) is misplaced. The
7 indictment in *Gordon* alleged conspiracies that occurred at
8 different times. The first was a conspiracy to defraud the
9 United States, ending in August or September of 1983. The second
10 was a conspiracy to obstruct a grand jury's investigation of the
11 first conspiracy, beginning in March of 1984. Trial counsel and
12 appellate counsel were not constitutionally ineffective by
13 failing to assert that Count One was duplicitous; the argument
14 has no merit.

15        3. <u>Special Verdict</u>.

16 Petitioner contends that he was denied the effective
17 assistance of counsel because of counsel's failure to request a
18 special verdict specifying the jury's verdict as to the object of
19 the conspiracy charged in Count One. Petitioner contends that he
20 was denied the effective assistance of appellate counsel because
21 appellate counsel should have argued that the absence of a
22 special verdict was plain error mandating resentencing him based
23 on the object of the conspiracy that required the lowest period
24 of incarceration, using communication facilities to facilitate
25 the commission of drug offenses.

26 Petitioner's claim is without merit. A special verdict form

was submitted to the jury and the jury specifically found Petitioner guilty of the conspiracy charged in Count I and that the United States had proved that the first object of the conspiracy was to aid and abet the manufacture of 50 grams or more of methamphetamine and had proved that the second object of the conspiracy was to possess pseudoephedrine, a listed chemical, knowing or having reasonable cause to believe it would be used to manufacture methamphetamine. (Doc. 211). Petitioner's claims of ineffective assistance of trial and appellate counsel on this ground are baseless.

For the reasons stated:

1. Petitioner Marco Negrete-Saenz's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 is DENIED;

2. The Clerk of the Court is directed to enter JUDGMENT FOR RESPONDENT.

IT IS SO ORDERED.

Dated:   July 22, 2008              /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE